IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

USDC- GREENBELT
'26 APR 16 PM4:38

```
LLOYD ST. ROSE,              )
                             )
        Plaintiff,           )
                             )
                             )          Civil Action No. 1:25-cv-254-LKG
v.                           )
                             )          Dated: April 16, 2026
CLIFTON T. PERKINS HOSPITAL, et al.,  )
                             )
        Defendants.          )
                             )
                             )
```

## MEMORANDUM OPINION

In response to the above-entitled civil rights complaint, Defendants filed a Motion to Dismiss for Failure to State a Claim. ECF No. 14. The motion is opposed by self-represented Plaintiff Lloyd St. Rose who is currently incarcerated in the Baltimore County Detention Center ("BCDC"). ECF Nos. 16, 24, 25. In addition to opposing Defendants' motion, Plaintiff has filed several supplemental complaints, amended complaints, as well as a Motion for Leave to File Another Amended Complaint and a Motion for Leave to Proceed in Forma Pauperis. ECF Nos. 26 – 37. Upon review of the pleadings filed, there is no need for a hearing in this matter. D. Md. Local R. 105.6 (2025). For the reasons stated below, Defendants' motion will be granted in part and denied in part.

I.      BACKGROUND

A.      Complaint Allegations

*Claim 1*

Plaintiff claims that from June 2, 2022, through February 3, 2023, Defendants Nurse Aime, Nurse Barri, Dr. Udapi, Dr. Moran, and Kristin Goldscher, deliberately denied him medical treatment for an injury to his genitals that occurred at Clifton T. Perkins Hospital ("CTPH"). ECF No. 1 at 3. He claims that the failure to provide him with medical treatment has resulted in permanent injury. *Id.* According to Plaintiff the delay and ultimate denial of medical treatment was caused by Nurse Barri and Nurse Aime not reporting medical requests and Dr. Udapi failing to set up medical referrals within CTPH. *Id.* at 5.

He states that the Defendants were notified of his requests for treatment on September 7 and 8, 2022; October 3, 2022; December 7 and 12, 2022; January 9, 2023; and "many other dates." *Id.* The symptoms he reported included urinary incontinence, inability to urinate, "urination to body cavity," pain, nausea, shrinkage of penis and testicles, depletion, numbness, and extreme high blood pressure. *Id.* He claims that a "partial examination discovered several conditions" including hydrocele, epi appendix, and pelvic floor abnormality. *Id.* According to Plaintiff, the main issue was depletion and lack of blood flow to the genital area. *Id.* He claims that his testicle size decreased significantly during the time frame and that this was documented by a doppler scan. *Id.* He states that this may have permanently affected his ability to father a child. *Id.* Plaintiff claims that he was not given a full examination by Dr. Udapi prior to his transfer back to BCDC. *Id.* at 7.

*Claim 2*

Plaintiff also claims that when he was transferred to CTPH on June 2, 2022, he was a victim of two sexual harassment incidents. ECF No. 1 at 7. He claims another patient, Dominique Reed, made advances toward him. *Id.* Plaintiff reported the incidents to the "MDH Police" and filed a report through the hospital's residence grievance system. *Id.* at 8. Plaintiff adds that he reported Reed's behavior to Dr. Gormu and told him that the behavior was very disturbing to him "as a heterosexual and TBI patient." *Id.* Plaintiff explains that he made the reports after Reed began mirroring him and making threats of violence toward him. *Id.* Plaintiff was told that Dr. Gormu and hospital staff would talk to Reed and tell him to stop the behavior and to stay ten feet away from Plaintiff. *Id.*

Despite the reassurances, Plaintiff claims that Reed's behavior continued and shortly thereafter the hospital staff chose to move Plaintiff to a new wing instead of moving Reed. *Id.* Plaintiff told Dr. Gormu that he did not want to move and that he believed he was being moved as retaliation because the new wing housed patients who were violent and less stable. *Id.* Plaintiff claims that soon after he moved to Ward 2 West, he began to experience abuse. *Id.* He further claims that documents supporting this claim were stolen from him by social worker Kristen Goldscher on February 3, 2023. *Id.*

*Claim 3*

Plaintiff states he was illegally held in custody at CTPH without a court order for eight months. ECF No. 1 at 9-10. He states that on June 2, 2022, he was sent to CTPH after being

found not competent to stand trial "in conjunction with having a mental health disorder." *Id.* at 9. Plaintiff takes umbrage with this because he sustained a traumatic brain injury ("TBI") during his arrest on November 21, 2021, when he was shot in the back of the head. *Id.* In his view, he should have been sent to a brain trauma center for treatment.

When Plaintiff arrived at CTPH, he claims he informed the staff of his medical history, including that he had no history of mental health disorders and that he sustained a TBI in November. *Id.* Despite providing this information, Plaintiff was admitted to the hospital, which he claims was illegal because the "court order that committed me [was] for the requirement of having a mental illness." *Id.*

On October 3, 2022, Plaintiff was found competent to stand trial though he received no mental health treatment nor any treatment for his TBI. *Id.* In light of the lack of treatment he received, Plaintiff asserts that there was no reason for his admission to CTPH, nor was there a reason to keep him there. *Id.* He takes the position that holding him there was a violation of his constitutional rights and mental health law. *Id.* at 10.

*Claim 4*

From June 2, 2022 to February 3, 2023, while confined to CTPH, Plaintiff claims that he reported another injury to Dr. J. Carroll and Dr. Udapi that resulted from "negligence and inadequate medical care." ECF No. 1 at 10. He states that he told Dr. J. Carroll that on July 7, 2022, he broke his rear tooth (#18) on a foreign object while eating a meal served in the cafeteria. *Id.* Plaintiff states that the tooth, which was also noted to be cracked, became infected and Dr. Carroll prescribed the antibiotic Clindamycin from July 7 through 14, 2022. *Id.* According to Plaintiff, he had completed the course of antibiotics which was "an ideal time to perform a tooth extraction" but the tooth was not extracted and it became infected again on August 31 through September 10, 2022. *Id.* Plaintiff was then prescribed Clindamycin again. *Id.*

On September 17, 2022, Plaintiff states he was prescribed two other medications by Dr. Linkan Xu at UMMC but the drugs he prescribed "conflicted with Cephalexin which he was prescribed on 9/20/22" for his prostate infection. ECF No. 1 at 10. Plaintiff recalls that he continued taking Cephalexin until October 4, 2022, and the tooth was extracted on November 4, 2022, at UMMC. *Id.* He claims that before the extraction was completed the dentist noticed he had a fractured jaw directly below the broken tooth. *Id.* Plaintiff claims that the fracture in his

3

jaw was not there in July when x-rays of his teeth were performed at CTPH. *Id.* at 11. Plaintiff concludes from this information that the fracture in his jaw was caused by the infections in his tooth and the delay in having it extracted. *Id.*

Plaintiff states he experienced the following symptoms as a result of what he characterizes as inadequate medical care: "renal failure, broken jaw, pain, swelling, raised tooth, fever, crossbite, movement of teeth, difficulty eating, tooth abscess and numbness." ECF No. 1 at 11. On October 3, 2022, Plaintiff notified Dr. Carroll and Dr. Udapi that he wanted to submit a claim with the hospital for the injury due to complications from his infected tooth, but he received no response before he was discharged on February 3, 2023. *Id.* He states that the "inadequate care violated his constitutional rights as it led to injury and permanent consequence." *Id.*

As relief, Plaintiff seeks "the ability to press charges for negligence/abuse; . . . to get an examination to determine full extent of injuries and to receive treatment; . . . [and] receive restitution for pain suffering, consequential damages." ECF No. 1 at 4.

### B.    Defendants' Response

Defendants assert in their Motion to Dismiss that Plaintiff has failed to comply with Maryland's Health Care Malpractice Claims Act requirements for pursuing a medical malpractice claim; Plaintiff's claims are barred by the applicable statute of limitations; the facts asserted do not state a constitutional claim; and the claims are barred by statutory immunity. ECF No. 14-1. Based on these deficiencies, Defendants claim that they are entitled to dismissal of the claims against them pursuant to Fed. R. Civ. P. 12(b)(6).

## II.    Standard of Review

In reviewing the Defendants' Motion Dismiss, the Court accepts the well-pleaded allegations as true and in the light most favorable to Plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "However, conclusory statements or a 'formulaic recitation of the elements of a cause of action will not [suffice].'" *E.E.O.C. v. Performance Food Grp., Inc.*, 16 F. Supp. 3d 584, 588 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above a speculative level." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).

4

Although pro se pleadings are construed generously to allow for the development of a potentially meritorious case, *Hughes v. Rowe*, 449 U.S. 5, 9 (1980), courts cannot ignore a clear failure to allege facts setting forth a cognizable claim. *See Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 391 (4th Cir. 1990) ("The 'special judicial solicitude' with which a district court should view such pro se complaints does not transform the court into an advocate. Only those questions which are squarely presented to a court may properly be addressed.") (internal citation omitted)). "A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are not more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009).

## III.    Discussion

### A.    Medical Claims

Although Defendants construe Plaintiff's claims as malpractice claims requiring compliance with Maryland's Health Care Malpractice Claims Act, Plaintiff has explained that he intended his claims to be constitutional claim for deliberate indifference to serious medical needs in violation of his Fourteenth Amendment rights. ECF No. 16 at 1, ¶ 2; ECF No. 25 at 2. Plaintiff's claims are construed generously and in a light most favorable to him.

Claims of inadequate medical care raised by involuntarily committed psychiatric patients are governed by the "professional judgment" standard rather than the deliberate indifference standard applicable to claims raised by convicted prisoners. *See Youngberg v. Romeo*, 457 U.S. 307, 323; *Patten v. Nichols*, 274 F.3d 829, 838 (4th Cir. 2001). This is due to the fact that they "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 322. *See also Ingraham v. Wright*, 430 U.S. 651, 671 n.40, (1977) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."); *Bell v. McAdory*, 820 F.3d 880, 882 (7th Cir. 2016) ("States must treat detainees at least as well as prisoners, and often they must treat detainees better—precisely because detainees (whether civil or pretrial criminal) have not been convicted and therefore must not be punished."). "Applying the deliberate indifference standard to the [Plaintiff's] claim would be giving involuntarily committed patients the same treatment as that afforded to convicted prisoners, a result the *Youngberg* Court specifically condemned." *Patten v. Nichols*, 274 F.3d 829, 838 (4th Cir. 2001).

The professional judgment standard requires more than negligence. *See Doe 4 by and through Lopez v. Shenandoah Valley Juvenile Center Commission*, 985 F.3d 327, 342 (4th Cir. 2021). "[E]vidence establishing mere departures from the applicable standard of care is insufficient to show a constitutional violation[.]" *Patten*, 274 F.3d at 845. The evidence must show "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. Under this standard, courts do not determine the "correct" or "most appropriate" medical decision. *Patten*, 274 F.3d at 845 (internal citation and quotation marks omitted). "Instead, the proper inquiry is whether the decision was so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one." *Id.* (internal citation and quotation marks omitted). By applying this standard, a court "defers to the necessarily subjective aspects of the decisional process of institutional medical professionals and accords those decisions the presumption of validity due them." *Id.* Nonetheless, a decision earns this deference only if it reflects an actual exercise of medical judgment. *See Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). In applying the standard, this Court must ensure that the "choice in question was not a sham or otherwise illegitimate." *Patten*, 274 F.3d at 845. Decisions made by medical or other professionals are presumptively valid, and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323; *see Patten*, 274 F.3d at 845–46 (stating that the defendant's actions must have "so substantially departed from professional standards that their decisions can only be described as arbitrary and unprofessional").

Plaintiff's first claim concerns his complaint regarding pain and discomfort in his genitals which he informed Defendants Aime, Barri, Udapi, Moran, and Goldscher about beginning in early September, 2022, but they did nothing in response until he repeated his complaint several times. ECF No. 1 at 3-5. In his opposition response, Plaintiff states that he was diagnosed with prostatitis, dysuria, pelvic floor dysfunction, "epi appendix," hydrocele, penile abnormality, papules, incontinence, severe pain, shrinking genitals, and low blood pressure to genitals. ECF No. 25 at 6. Plaintiff's claim is that he was denied appropriate medical care for these symptoms for over six months, causing him to suffer pain needlessly. *Id.* at 8. Defendants have offered no

basis for finding that the delay in providing Plaintiff with care for the serious complaints described were the result of professional judgment. Indeed, they fail to explain the delay at all and simply state that because Plaintiff ultimately received medical care for this condition, his claim fails. The Motion to Dismiss will be denied on this claim.

Plaintiff's second medical claim concerns dental care. ECF No. 1 at 10. In this claim, Plaintiff asserts that he cracked a tooth, which then became infected, and he was prescribed antibiotics that conflicted with antibiotics prescribed for his prostate infection. *Id.* Plaintiff has provided relevant dental records documenting his encounters with the dentist for the care of his cracked tooth. ECF No. 16-2 at 3-5. That record demonstrates that Plaintiff was treated by the dentist on July 7, 2022, for a crack in one of his teeth and that he was "not on board" with extraction of the tooth at that time. *Id.* at 3. Plaintiff was prescribed amoxicillin. *Id.*

When he returned on July 18, 2022, Plaintiff told the dentist that he cracked his tooth when he bit on something hard "since being at Perkins" and it was noted that Plaintiff had not mentioned that before. *Id.* at 3-4. At this appointment, Plaintiff suggested he should be compensated with a tooth replacement at the State's expense. *Id.* at 4.

On July 25, 2022, Plaintiff was again seen by the dentist and, at this appointment, agreed to have his cracked tooth extracted. *Id.* at 4. He was referred to University of Maryland Medical Systems (UMMS) for the procedure. *Id.*

On August 31, 2022, Plaintiff returned after the extraction, and it was noted he had no facial swelling and no swelling of the tongue or his gums. *Id.* He was given ten days' worth of Motrin for pain and there was a plan to re-evaluate him in 48 hours. *Id.*

On November 1, 2022, Plaintiff agreed to a second tooth extraction which was performed three days later. ECF No. 16-2 at 5. On November 4, 2022, Plaintiff told dental staff that he had a "hairline crack" in his jaw and that the Oral Surgeon told him it was from the pressure of the infection. *Id.* There is a note in the record that no report confirms what Plaintiff was saying. *Id.* Ten days later when Plaintiff was examined, he was observed to have no pain or swelling and he voiced no concerns. *Id.*

The dental records submitted by Plaintiff and the claims he raises consisting of his disagreement with the prescription antibiotics he was prescribed and the timing of the surgical extractions of his teeth, establish that the decisions made and the actions taken by Defendants were the result of the exercise of their professional judgment. Selection of antibiotics to

prescribe for treatment of an infection and withholding surgical intervention until the patient gives his consent, are aspects of professional judgment that all medical and dental providers exercise in their daily practice. *See Patten*, 274 F.3d at 845 (professional judgment standard makes any attempt by the courts to determine the correct medical decision inappropriate). Thus, the evidence submitted by Plaintiff defeats his claim regarding his dental care.

### B.    Sexual Harassment

Plaintiff's claim that he was sexually harassed by another patient and that his complaint regarding the behavior was mishandled because the other patient was not moved to another wing, is also governed by the professional judgment standard.

> [Plaintiff] thus enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests. Such conditions of confinement would comport fully with the purpose of respondent's commitment. In determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness. Such a presumption is necessary to enable institutions of this type—often, unfortunately, overcrowded and understaffed—to continue to function. A single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages.

*Youngberg*, 457 U.S. at 324-25 (internal citations omitted).

Plaintiff alleges that after he reported the disturbing behavior of another patient, he was told that Dr. Gormu and hospital staff would talk to the patient, and instruct him to stop the behavior and remain ten feet away from Plaintiff. ECF No. 1 at 8. When that did not resolve the problem, Plaintiff was moved to another wing of the hospital. *Id.* The fact that Plaintiff did not agree with the resolution of the problem is not a basis for a constitutional claim. This claim must be dismissed.

### C.    Illegal Detention

Plaintiff claims that his detention in CTPH was illegal because there was no court order requiring his confinement there. ECF No. 1 at 9-10. Plaintiff may not challenge the legality of his detention through a civil rights complaint. "[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal

8

remedy is a writ of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973).  Further, the premise of Plaintiff's claim is incorrect; the validity of his custody is based on his arrest warrant, not on the order requiring evaluation of his competence to stand trial.  This claim shall be dismissed.

## IV.    Conclusion

Defendants' Motion to Dismiss is DENIED as to Plaintiff's claim regarding treatment of the injury to his genitals and is  GRANTED in all other respects.  Plaintiff's Motion for Leave to Proceed in Forma Pauperis (ECF No. 34) is GRANTED and his Motion for Leave to File Amended Complaint (ECF No. 31) is GRANTED on the limited basis that the Amended Complaint may only concern the ONE CLAIM that has not been dismissed in this case. Following Plaintiff's filing of his Amended Complaint within the time required in the Order that follows, Defendants are directed to file a response.

**IT IS SO ORDERED.**

4-16-2026
Date

LYDIA KAY GRIGGSBY
United States District Judge

9